# John M. Hoffman v. Daniel B. Harrington.

*Administrator's sales :*    *Statute construed :*    *Indirect purchase by administrator :*
    *Bona fide purchaser.*    Whether under our statute (*Comp. L. 1871,* § *4562*) for-
    bidding executors, administrators or guardians, in making sales of land, from
    directly or indirectly purchasing, or being interested in the purchase, and
    declaring sales made contrary thereto to be void, a sale to another with the
    understanding that he should hold for the benefit of the administrator, to pro-
    tect his interest as the largest creditor of the estate, is such an "indirect pur-
    chase" by the administrator as the statute is aimed at, and therefore void, not
    only between the original parties, but also, at least where the administrator's
    deed has never been recorded, as against a *bona fide* purchaser from the nominal
    purchaser at such sale, as held by CHRISTIANCY, CH. J., with whom COOLEY, J.,
    concurred; or whether, on the other hand, this statute is to be considered as
    a mere adoption by the legislature of what the courts had theretofore held to be
    the rule without any statute, and therefore to be construed as subject to the
    same qualifications and exceptions in favor of *bona fide* purchasers to which
    the doctrine as before developed by the courts was subjected, as held by
    GRAVES, J., with whom CAMPBELL, J., concurred:—*Quære?*
*Trespass quare clausum:*    *Tax deeds:*    *Color of title:*    *Evidence.*    In an action
    of trespass for entering lands, etc., tax deeds which the evidence shows are
    void may be treated as color of title; and if the defendant took possession
    under them, they are admissible in evidence, as tending to show what, and how
    much, land he claimed.
*Bill of exceptions :*    *Loss of deed :*    *Evidence.*    Whether a recital in the bill of
    exceptions, as to the loss of an administrator's deed, that "the plaintiff's
    counsel offered the probate records, showing the appointment of" an adminis-
    trator named, etc., "and also tending to show sale of the lots in question to
    one Joseph P. Minnie, and the execution of a deed which had been lost," is
    any thing more than a mere statement that the probate records alone were
    offered to prove the loss of the deed, is at least doubtful; but as the objec-
    tion is, not specially that there was no proof of the loss, but only that the
    contents were not proved, the case is considered as if the bill had stated that
    "evidence was also given tending to show the loss."
*Practice in supreme court :*    *Record :*    *Contents of deed :*    *Evidence.*    The record in
    this case showing that evidence was given tending to show the sale of the lots
    in question by the administrator to Minnie, and the execution of a deed upon
    that sale, the objection that the contents of the deed were not proved, is not
    sustained.
*Practice in supreme court :*    *Record :*    *Presumptions.*    The record failing to show
    affirmatively when an administrator's sale, which the court below held was void
    under the statute (*Comp. L. 1871,* § *4562*), was made, it is presumed, in support
    of the judgment, that it was made after the statute took effect.
*Quit-claim deed :*    *Usual form.*    The expression, "a quit-claim deed in the usual
    form," considered and held, under our statute (*Comp. L., 1871,* § *4205*), to intend
    such a deed as operates as a deed of bargain and sale, and as is sufficient to pass all
    the estate the grantor could lawfully convey by deed of bargain and sale.
*Quit-claim deed :*    *Clause construed :*    *Reservation.*    A clause in such a deed, fol-
    lowing the description of the lands, that "this conveyance is intended to
    embrace all titles and interests accruing for the purchasing for taxes, delin-
    quent or otherwise, up to and including the year 1863," will not operate to

limit or confine the effect of the deed to the interests under the tax purchases alone, or to reserve any other interest the grantor had at the time.

*Practice in supreme court.* The court being equally divided on the main point, but all agreeing that no other error was committed, the judgment below is affirmed.

*Heard April 30.    Decided October 14.*

Error to St. Clair Circuit.

*A. E. Chadwick,* for plaintiff in error.

*Trowbridge & Atkinson,* for defendant in error.

CHRISTIANCY, CH. J.

This was an action of trespass, brought by Hoffman against Harrington in the St. Clair circuit, for entering upon certain lots in the city of Port Huron, tearing down a fence placed around the lots by the plaintiff, and removing the sills of a house he was preparing to build there.

The evidence tended to show that, for some two years prior to the trespass complained of, the defendant was, and up to the time the plaintiff commenced building the fence, continued to be, in possession of the lots, claiming to own them under certain deeds from the auditor general for delinquent taxes, and certain leases from the city for delinquent city taxes, as well as under a quit-claim deed from one Geel, who, the evidence tended to show, was one of the heirs of John Thorn, the patentee of the lands; and that he used the lots for storing spars, boom poles and other timber thereon, driving piles in front of the lots along the river and filling up portions of some of the lots with sawdust; though he had never fenced the lots, as a fence would interfere with their use for such purposes; that on Friday or Saturday, the 18th or 19th of February, 1869, the plaintiff, having just then obtained the quit-claim deed of the lots from Hamilton (more particularly noticed hereafter), employed a number of men and teams, entered upon the lots, drew off the spars and timber of defendant, and in a hurried manner built a fence around the lots, and

drew on some sills for a house. On the Monday following, Harrington drew part of his spars, etc., back upon the lots, and tore down, or was tearing down, the fence, when he was forcibly resisted and driven off by Hoffman and his men. These acts of Harrington constitute what is claimed as the trespass in this case; and it was conceded on the trial that these acts constituted a trespass for which the defendant was liable, unless his acts were justifiable as against the plaintiff.

Upon the evidence in the case, the court properly instructed the jury that the tax deeds and leases, under which the defendant claimed, were void; but that they might, nevertheless, be treated as color of title; and if possession had been taken under them, they were admissible as tending to show what, and how much land defendant claimed. And the question of defendant's prior and continued possession under claim and color of title was fairly submitted to the jury.

If the defendant was, at the time of plaintiff's hurried entry and building of the fence, and had previously been, so in possession, it is clear, under the circumstances, not only that he had a right to enter, tear down the fences so recently and hurriedly put up, and to regain his possession, if he could peaceably do so, unless the plaintiff had the title, or the legal right of possession under the true owner; but it is equally clear that unless the plaintiff had such title or right, prior to his own entry, that entry and the building of the fence, and other acts done by him, made the plaintiff a trespasser in taking the possession, rather than the defendant for retaking it.

But the plaintiff claimed title through a sale and deed, claimed to have been made by one Hamilton, as administrator on the estate of John Thorn, the patentee, to one Minnie, a deed from the heirs of said Minnie to said Hamilton, and a subsequent deed of February 18th, 1869, from Hamilton to the plaintiff. The deed from Minnie's heirs

to Hamilton, and from the latter to the plaintiff, were duly proved, and no question arises upon them.

On the other hand, the deed from Geel to the defendant was made subsequent to the sale by the administrator, and a question is raised whether this deed was intended to convey any interest Geel might have had or claimed as heir of Thorn, or only such interest as he had acquired by purchases for taxes.

But, as the deed from the administrator, if valid and sufficiently proved, must defeat the deed of Geel as to any interest he may have had as heir, whether he intended to convey it or not, we will first consider the proof and the validity of the alleged deed from the administrator.

As to the administrator's sale, the bill of exceptions states that, "the plaintiff's counsel offered the probate records, showing the appointment of Samuel W. Hamilton as administrator of John Thorn's estate, and also tending to show sale of the lots in question to one Joseph P. Minnie, and the execution of a deed which had been lost." As no deed was to be made by the administrator, till the report of the sale made by him, and its confirmation (*Rev. Stat. of 1846, ch., 77, § 21*), and the confirmation of the report would be the last entry upon the probate record, it is difficult to see how that record could tend to show the loss of the deed, if in fact it could have any tendency to show its execution (*Ives v. Ashley, 97 Mass., 205*); yet, as I understand the language above quoted from the bill of exceptions, it refers to the probate record as *the* evidence tending to show both the execution and the loss of the deed. Evidence, however, was subsequently given (which will presently be noticed) of the execution of the deed from the administrator, and of its being left with a third person for the purchaser, but no evidence of any search for the deed is stated at all, and none of its loss, except that above quoted from the bill, which refers only to the probate record, as tending to show the loss. But, as it is possible the last clause above quoted from the bill may have been under-

stood by counsel in framing the bill, as intended to state that "evidence was also given tending to show" the loss; and the counsel for defendant in error does not specially object that there was no evidence tending to show the loss, but only that the contents were not proved, I do not rest my opinion upon the point that there was no evidence of the loss, but shall proceed to consider the case as if the loss had been shown. As to this objection, that the contents of the deed were not proved, I do not think it can be sustained (if the loss was shown). What are we to understand by the statements of the record, that evidence was given tending to show the *sale of these lots* by the administrator to Minnie, and the execution of a deed upon that sale, if it is not a sale and conveyance of these lots by the administrator to Minnie, and that such were the contents of the deed?

Hamilton testified that he "made the sale as administrator; made deed and left with one McAlpine, by arrangement with Minnie, for Minnie to get whenever he wanted it." On cross-examination he testified "that it was the understanding between him and Minnie that Minnie should buy the lots to protect his" [Hamilton's] "interest as a creditor,—he being the largest one,—of the estate; that Minnie did so bid; that there were other bidders at the sale, but Minnie was the highest bidder. It was understood that Minnie should hold the land for his" [Hamilton's] "benefit."

The fact that Minnie bid in the land for the administrator, thus making the administrator's sale indirectly to himself, is undisputed, and there is no evidence or pretense to the contrary.

The court charged the jury that if they believed this evidence, and that by an arrangement between the administrator and Minnie, the latter was to pay nothing for the lands, but was to convey them to the administrator, or to hold them for his special benefit, then, as matter of law, such sale was void *as against the heirs of Thorn.*

This charge raises the question of the validity of this deed, and if invalid as to any parties, the further question, how far its invalidity will affect the plaintiff as a purchaser from Hamilton, without notice of the facts rendering it invalid.

The statute (*Rev. Stat. of 1846, ch. 77, § 18 ; Comp. L. 1871, ch. 163, § 18*) provides: "The executor or administrator making the sale, and the guardian of any minor heir of the deceased, shall not directly or indirectly purchase, or be interested in the purchase of any part of the real estate so sold; and all sales made contrary to the provisions of this section shall be void; but this section shall not prohibit any such purchase by a guardian for the benefit of his ward."

It does not distinctly appear from the record when this administrator's sale took place ; though I infer from the judge's statement in the charge, that John Thorn died not very long previous to 1864, and that this sale was made since the passage of the above statute.   At all events, as it devolves upon the plaintiff to show affirmatively the error of which he complains, his failure to show, by the bill of exceptions, when the sale was made, requires us to presume in favor of the correctness of the charge, that the sale was subsequent to this statute, if the statute upon that state of facts would justify the charge.   I shall therefore proceed upon this hypothesis.

Now, if the purchase by Minnie, above stated, for the benefit of Hamilton, the administrator, does not constitute an "indirect purchase" by the administrator, within the plain meaning of this section, then it is impossible to assign any intelligible meaning to the prohibition.   Had he purchased in his own name, the purchase would have been a direct one; procuring another to purchase for his benefit, is precisely what is intended by the statute as the indirect purchase intended to be prohibited.   This is so plain that no one would insist upon the validity of such a deed, even as to a subsequent purchaser claiming through

it, had the sale and deed been made directly to the administrator himself, or indirectly to a third person for his benefit, if, in the latter case, such subsequent purchaser had notice of the facts.     But it is insisted that the sale and deed are good as to a subsequent purchaser without notice, and that they must therefore be held valid as to the plaintiff.

The statute, however, equally applies to, and equally prohibits and makes void such a sale, whether it be directly or indirectly made to the administrator, or for his benefit.     It places such sales, whether direct or indirect, upon precisely the same grounds, and makes no distinction between them.     It makes both simply and absolutely void, and, of course, illegal by its express enactments.     If the invalidity can be waived in one case, it can also in the other.     There is no exception or qualification, and no saving of rights in favor of purchasers of any kind, with or without notice, nor in favor of any person whatever.     And the question is, whether the courts can engraft such an exception or qualification upon the statute as the legislature did not think best to adopt, and restrict a provision which they chose to make general and unqualified.

For myself, I think the statement of such a question is its own answer.     To engraft such an exception or qualification upon this statute, unless there be some other statute with reference to which it was enacted, and which, when construed with this, would make such the combined effect of the two, would be an exercise of legislative power ; it would be making or revising, not expounding or construing the law.     Whether there be any other provision of our statutes to which this section is made subordinate, and which would have the effect to establish the qualification insisted upon, is another question which we shall examine in its proper place.     But if there be none, we are bound to give the same full effect to this section, whether the purchase was made directly by the administrator, or indirectly for his benefit.     Where a statute within the consti-

tutional power of the legislature expressly makes a transaction or contract void, and prohibits it, it makes it also illegal; and in all such cases it will be void as to all parties whose rights are not saved by the statute. This is too clear in principle to require the support of authorities. The statute of Ann made usurious contracts void without any saving clause in favor of the *bona fide* holder of commercial paper; and such paper was therefore held to be equally void as to them as it would be between the original parties.—*Chitty on Bills* (*9 Amer. ed.*), *110; Wyat v. Campbell, 1 M. & M., 80.* For other instances in illustration of the principle, see *Kilpatrick v. Byrne, 25 Miss., 571; Hyatt v. Taylor, 42 N. Y., 258; Woodbury v. Berry, 18 Ohio St., 461 and 462.*

In fact, I think the statute was only needed for just such indirect purchases as that before us. Our predecessors on this bench determined, in a case where the sale was made prior to this statute, that at common law a sale and deed made by two administrators to one of them, of the property of the estate, was void, and this, irrespective of the question whether there was in fact any fraud or not; and in this, I think, they were supported by the weight of authority.—See *Dwight v. Blackmar, 2 Mich., 330.* But where the sale to the administrator was indirect, in the name of another, it was somewhat questionable upon the authorities, whether the sale would not be held valid at law, and the party seeking to avoid it be driven to a court of equity. And the mischief to be guarded against—the temptation to fraud and collusion, and the difficulty of detection, the probable wrong and injury to result to heirs and creditors, if such sales were upheld—are just the same whether such sales be of the direct or the indirect kind.

But it may be urged that great injustice might be done to *bona fide* purchasers, unless such exceptions in their favor are allowed or implied. In reply to this it is sufficient to say, that the contest between such purchaser, on one side, and the heir, or his grantee (or creditors of the estate), on

the other, is one in which the equities are not, or would not generally be, all on the side of the purchaser, but frequently just as strong in favor of the heirs, who would, in effect, be wrongfully deprived of their just rights or claims by allowing such exception in favor of the purchaser. The real question generally would be, whether the innocent purchaser, on one side, or the innocent heir, on the other, should bear the loss occasioned by the wrongful and illegal act of the administrator, and whether the mischief, on the whole, would not be greater by allowing the exception in favor of the purchaser, than by denying it, and throwing upon him the necessity of inquiry when the title under the administrator's deed is denied. This, at least, was a question fairly within the province and discretion of the legisture, and which, therefore, they had the right to determine, and, as I think, have determined.

If it be said that the general rule or principle which renders the sale by an administrator to himself, or to another for his benefit, void, was one which was well settled, both in courts of equity and at law (which I do not think was the case at common law, as to indirect sales) prior to the statute, but settled with such well known qualifications as would sustain the present sale, as to purchasers from Minnie or his heirs, without notice of the interest of the administrator in the sale made by him, and that the legislature, in passing this statute, intended it as a mere declaratory provision, adopting the rule as already settled by the courts, and subject to the same limitations and qualifications; it is sufficient to say, in reply, that this position necessarily assumes that the legislature knew and understood what had been the course of decision upon the question, and how far and with what qualifications the courts had adopted the rule or principle in question. There is no ground for assuming that the legislature were aware of the rule as adopted by the courts, but ignorant of the limitations and qualifications with which they had adopted it. They must be presumed to have known the qualifica-

tions with which it had been adopted, as well as the rule
or principle.    When, therefore, the legislature, in so many
words, adopted the rule absolutely, without qualification,
where is the ground for any inference that, by such lan-
guage, they intended to adopt the qualifications, as well as
the rule?    Is not the contrary inference much stronger?
Would it not be better to say at once, "we will adopt the
qualifications, though the legislature did not so intend,
because, in our opinion, they ought to have made the pro-
vision subject to these qualifications?"

We are next to inquire whether there is any other stat-
ute with reference to which the section above cited was
enacted, and which has the effect to establish the exception
or qualification claimed in favor of the purchaser from
Minnie's heirs.

As the administrator's deed to Minnie was not recorded,
the plaintiff did not purchase on the faith of its record.
Had it been recorded, and had the plaintiff purchased on
the faith of its record, without notice that the purchase
was made for the administrator, the case would probably
have come within the registry laws, upon the same prin-
ciple that the deed from Thorn himself would have come
within them, so far, at least, as regards questions of the
kind here presented.    But as the deed was not recorded,
and the plaintiff did not purchase on the faith of it, but
well understood that the transmission of the Thorn title to
Minnie depended wholly upon facts outside of the record,
in other words, upon such parol evidence as might be
found to furnish the necessary link, he should, as between
him and the heirs of Thorn, or their vendees, be held to
assume the risk of ascertaining the whole state of facts as
they actually existed.

By *section 52 of chapter 77, Revised Statutes of 1846,*
(*Comp. L. 1871,* § *4596*) it is enacted: "In case of an action
relating to any estate sold by an executor, administrator
or guardian, in which an heir, or other person claiming
under the deceased, or in which the ward, or any person

claiming under him, shall contest the validity of the sale, it shall not be avoided on account of any irregularity in the proceedings, provided it shall appear," etc., then specifying five necessary prerequisites. If the deed from Geel to defendant conveyed any interest he might have had as heir of Thorn, then the defendant would stand in the position of an heir, and have the right to contest the sale on all the same grounds. If that deed is to be confined to his interest derived under tax purchases, then the defendant claimed adversely to the deceased, and under the *54th section* of the same chapter, the sale could "not be held void on account of any irregularity in the proceedings; provided it should appear that the administrator was licensed to make the sale, by a probate court having jurisdiction, and that he did accordingly execute and acknowledge, in legal form, a deed for the conveyance of the premises." These sections only provide that the sale shall not be held void for "irregularities," provided the requisites specified in them respectively shall appear to have been complied with. The purpose of these sections, and what is meant by "irregularities," cannot be mistaken; had the statute *affirmatively* specified in detail the several steps or acts, which it should be the duty of the administrator to take or do, the omission to take any one of these steps, or do any one of these acts,—not made essential to the validity of the deed by the two sections last cited respectively,—would constitute the irregularities which these sections declare shall not render the deed void; provided the matters made essential by these sections shall be proved. These sections, therefore, clearly contain nothing which modifies in any respect the 18th section, which is prohibitory, forbidding the sale to, or for the use of, the administrator, and declaring it void.

The *53d section*, which makes the administrator and his bondsmen liable for any of his neglect or misconduct, by which any person interested in the estate shall suffer damage, manifestly refers to cases in which the acts of the administrator, though wrongful, would be binding upon

persons interested in the estate, and has no reference to a sale prohibited to be made at all, and expressly declared to be void if made. Persons interested in the estate can hardly be supposed to suffer legal damage from an act which is simply void and may at any time be treated as void, and as if it had never been done, and which therefore cannot affect their rights.

Nor does the *55th section* in any way refer to or affect the 18th. It renders the administrator " who shall *fraudulently* sell any real estate of his intestate contrary to the provisions of this chapter, liable in double the value of the land sold, as damages, to be recovered in an action on the case by the person having an estate of inheritance therein." But this is only on the ground of *actual fraud,* and applies to no other cases, while section 18 makes the sales referred to void, irrespective of the question of fraud, and whether there has or has not been fraud in fact; and when thus void, it could not prejudice the rights nor divest the title of the person having the estate of inheritance in the land.

None of these sections, therefore, relate to, or modify the effect of, the 18th section, all having a different object and purpose; and I am aware of no other provision of our statutes which can be claimed to have any such effect.

The sale and deed made by the administrator must be held void, as to the heirs of John Thorn, as charged by the court, and, of course, as to all parties deriving title through any of those heirs.

This ought, perhaps, to dispose of the case, as it can hardly be claimed that, under the circumstances shown, the plaintiff could maintain trespass without showing title. But as it is possible the jury might not have found the prior possession in the defendant up to the time of the plaintiff's entry (or trespass), had that question been submitted to them unmixed with the question touching the Geel deed, and they may have based their verdict for the defendant, in part at least, upon the title shown by him under that deed, we will consider the question raised upon that deed.

This deed is dated October 25th, 1864. Prior to this time Geel had purchased in the lands for the taxes of 1859, 1860, 1861, 1862, and 1863; but the purchase for the latter year had just been made, and he would not be entitled to the deed for this purchase until nearly a year thereafter; and whether he had yet actually obtained deeds for all the prior sales, does not appear; if not, he subsequently obtained them, and they were introduced in evidence.

As, in my view, the bill of exceptions is somewhat defective for the purpose of distinctly raising the question relied upon by the plaintiff in error, I here quote from the bill all that is claimed to present the question: "The defendant's counsel, to maintain the issue on his part, introduced a quit-claim deed from James M. Geel to the defendant, dated October 25th, 1864, describing the lots in question, in the usual form; and in the body of the deed, following the description of the lots, is the following language: 'This conveyance is intended to embrace all titles and interests accruing for the purchasing, for taxes, delinquent or otherwise, up to and including the year 1863,' as tending to show a conveyance to defendant of an interest in the land then held by said Geel, as heir of John Thorn, who it was conceded patented the land, and died seized of the same."

The question is, whether this reference to the tax purchases, and the declaration of the intent to convey the interest accruing under them, confined the entire operation of the deed, as a conveyance, to such interests as Geel had thus acquired by tax purchase, so as to prevent its taking effect, as a conveyance, upon any interest he might have had as an heir of Thorn. It is obvious this question might depend much upon the form of other parts of the quit-claim deed, besides that portion stated in the record. And as it devolves upon the plaintiff in error to show affirmatively that error has been committed, the bill, in order distinctly to raise the point, ought regularly to have given a copy of the deed, or of all such parts of it as, in the common forms of quit-claim deeds in this state, would

be likely to have any bearing upon the question. But allowing the plaintiff in error all that he could reasonably claim, and more than I think he is strictly entitled to upon this record, I assume, for the purposes of this case, that the quit-claim deed was in some one of the ordinary forms generally used in this state. All the printed forms that I have seen in use in this state, and most of them which have been written out, use, as the words intended to operate as the conveyance, "bargain, sell, remise, release, and forever quit-claim." Some may omit the words, "bargain and sell;" but under our statute (*Rev. Stat. of 1838, p. 258, § 6,* re-enacted in 1846; *Comp. L. 1871, § 4205*), a quit-claim deed, of the form in common use, operates as a deed of bargain and sale, and is sufficient to pass all the estate the grantor could lawfully convey by deed of bargain and sale; and such a deed when, after the words of conveyance to the vendee and his heirs forever, it describes the lands intended to be conveyed or quit-claimed, will, of course, transfer to the party to whom it is given all the interest of the party making it, in the land described, unless there be some exception or reservation, or words indicating an intent to reserve or except some interest, or to confine the conveyance to a part only of the rights or interests which the party making the deed had in the land and might have conveyed by the deed.

And so far as my own observation and experience (of thirty-seven years) have extended, I can safely say that in the usual form of quit-claim deeds in this state, as found in the printed blanks in common use, there follows, after the description of the land, general and sweeping language, intended to cover every possible interest the maker of the deed may or might have in the lands described; like that used in the quit-claim which came in question in *Dubois v. Campau, 24 Mich., 366* (or words equivalent in effect); which was held in that case to be important as showing the intent to convey all the grantor's interest in the land, viz.: "Together with all and singular the hereditaments and

appurtenances thereunto belonging, or in any wise apper-
taining; and all reversion and reversions, remainder and
remainders, rents, issues, and profits thereof; and all the
estate, right, title, interest, claim, or demand whatsoever of
the said party of the first part, either in law or equity
of, in, and to the above bargained premises, with the said
hereditaments and appurtenances." In some of the forms
this is greatly abridged; but they generally, if not always,
contain, after the description of the land, general language
showing clearly the intent to convey all the interest the
grantor, or person making the deed, had in the land; and
such also is the form generally adopted in deeds which are
written out in full without the use of a blank form. In
such a deed it seems to me very clear that the words
which are to exclude from the operation of the deed any
interest which the grantor (person making the deed) has
in the land described as conveyed, must operate as an
exception or reservation, or at least evince a clear intention
to reserve or except the interest which would otherwise
pass; and that a mere affirmative declaration, after the
description of the lands described as conveyed, that "this
conveyance is intended to *embrace* all titles and interests
accruing from tax purchases, etc., up to and including the
year 1863," cannot be construed to operate as a negation
upon, or exclude any other interest from, the operation of
the deed, which the maker of the deed had at the time,
and which would otherwise clearly pass. On the contrary,
I think the very form of expression: "This conveyance is
intended to *embrace*" [which, in this connection, means
nothing more than if he had said "to include"] "the
interests accruing from the tax purchases," etc., involves an
affirmative implication, of some slight force at least, that
there were also other interests or titles being conveyed by
the deed; and if it had been the intention to exclude such
other interests from its operation, and to convey only the
interest accruing under these tax purchases, the grantor
would not merely have said, "the intention of this instru-

ment is to *embrace* or *include* such tax interests;" but he would have said, at least, "the intention of this conveyance is to convey *only* such interests as I may hold in said lands derived from purchases at tax sales." Or there might have been more room for doubt, and more plausible ground for the construction claimed by the plaintiff in error, if the deed had merely said, "this conveyance being intended to *convey*" (instead of "*embrace*") "these interests derived from tax purchases;" there would have been more reason for saying the intention was to confine the conveyance to those interests alone; but here it is only declared to be the intention to embrace or include those interests in the conveyance.

But it is asked, "Why speak of the interest under the tax purchases at all, unless it was intended to confine the conveyance to that, as that interest would have passed without being mentioned?" This argument might have greater force, if it were not so very common to insert in conveyances of real estate many things which are wholly unnecessary, in the attempt to render the intention very clear, which, in unskillful hands, often ends in obscuring it. But I think the record itself furnishes matter for a probable explanation of this reference to the interests acquired by the tax purchases. Geel had made at least one of those purchases upon which he was not yet entitled to a deed; and it does not appear that he had then obtained the deeds on all his former purchases. The idea may therefore have occurred to the person drawing the deed, that, as a mere quit-claim would not convey an after acquired title (should the tax deeds be subsequently issued to Geel), it might be as well to declare expressly that the deed was intended to convey Geel's interests in all those tax purchases, so as to cover the case, whether they had been issued or not; hence, also, the express inclusion of that for the year 1863, upon which no deed could yet be obtained.

But whether such is the true explanation of the reason for inserting the clause in the deed, or not, I am satisfied

the deed cannot be construed as confined to the interests under the tax purchases, without doing violence to its language, reversing the rule that a deed should be construed most strongly against the grantor, and adopting a latitude of construction which would be extremely dangerous in future cases.

This deed, therefore, was properly construed by the circuit judge, and, with the other evidence in the case, tended to show that he had obtained the interest of one of Thorn's heirs in the premises; and upon that ground, as a tenant in common with the other heirs (few or many), was entitled to the possession as against the plaintiff.

Several other exceptions were taken, and errors assigned, but as they were not pressed by the counsel for the plaintiff in error, and upon looking into them we think it clear they are not well founded, we do not notice them here.

I think the circuit court was correct in all his rulings, and the judgment should be affirmed, with costs in both courts to defendant in error.

COOLEY, J., concurred.

GRAVES J.

I am not able to agree with the chief justice, respecting the operation of the statute against a purchase by or in the interest of an administrator at his own sale.

Such a purchase was as fully forbidden by the common law as it is by this statute.—*Beaubien v. Poupard, Harr. Ch.,* 206; *Walton v. Torrey, ib., 259; Dwight v. Blackmar, 2 Mich., 380; Tufts v. Tufts, 3 Mood. & M., 456; Ames v. Downing, 1 Brad. Sur. R., 321; Woodruff v. Cook, 2 Ed. Ch. R., 259; Hawley v. Cramer, 4·Cow. R., 717; Hunt v. Bass, 2 Dev. Eq., 292; Walker v. Walker, 101 Mass., 169; Tiff. and Bull. on Trusts, 149.* A large number of cases illustrating the doctrine and its application will be found in the American note to *Fox v. Mackreth, 1 L. C. in Eq.*

The provision was a mere re-enactment of the rule which the courts had laid down prior to its passage, and like many others, was simply intended as a legislative recognition of a doctrine developed by the tribunals and considered worthy of being made stable by adoption into the statute book.

In passing upon fiduciary transactions during a course of years the courts had settled upon the rule as one eminently just and politic, but they had also recognized certain principles to regulate its application, and without which it might be turned into an engine of mischief. And when the legislature came to revise and re-arrange a system of positive leading rules to govern in the case of sales by executors, administrators, and guardians, they appreciated the value of this one, and very naturally included it.

In doing this they did not change the law.  They only made that positive which was not so before.  They did not think it needful to go further and convert into positive law all the principles of application which had been found essential, any more than they thought it proper to forecast the principles of application which the possibilities of the future might require.

As the rule itself was no new thing, but something merely taken from the body of the unwritten law and put into the written code, it was natural to expect that it would be expounded and applied in the spirit of the common law and in harmony with the principles which had guided the courts before.

These principles were not set aside or impugned.  They remained as vital as ever, and since the only change effected was in carrying this rule, which was already law, from the ·unwritten to the written code, I cannot see why it should be administered in a new spirit and contrary to the principles natural to it.  They accompanied the rule into the statute book, as I think, and should be recognized in applying it.

If we reject these principles and take the provison as one to be applied in a sense as universal as the terms will literally allow, then every sale by an executor, administrator, or guardian, in which the trustee has an interest, however secret, is *ipso facto* void, in the sense of being a nullity. It has no force whatever. It is bad as to everybody and all transactions. No one is bound by it, and no one can be benefited by or through it.

Whether the deed given on the public sale is recorded or unrecorded, whether a full price was or was not paid and applied for the estate, whether the sale was or was not confirmed in regular form by the court, whether or not the party claiming title under it through a subsequent purchase bought in good faith for a full price and without notice, can make no difference.

It never had effect because the law forbade it. We are compelled to go to this length, or confess that such a sale is not made positively illegal and so completely nugatory. If not void as a sale, it must have some of the legal possibilities of a valid sale. There is no practical middle ground. We cannot stop short of the extreme view, without confessing that the law was not intended to make such sales wholly ineffectual and inoperative, as to all persons and circumstances, nor without admitting that they may avail to some purposes, and for and against particular parties, and hence that they are to be regarded simply as voidable, and not as nullities; and if we accept this conclusion, we tacitly admit that in applying the act we are not only authorized but required to mitigate its scope.

Now I understand it to be conceded that we ought to qualify its operation. If we may do this, if we may say that such a sale is not a nullity but may have some force, by what principles are we to be governed? Where shall we pause? What reason can be given for halting short of the view which was settled when the rule was worked into the statute?

Can any safer guide be imagined than that furnished by the principles which the courts had laid down, and which the legislature presumably contemplated when they made the rule positive?

There is no question but that a statute may be cut short by the common law, and even a constitutional provision may have a modified application in consequence of a construction based on its original connection with clauses subsequently erased by amendment.—*Fletcher v. Peck, 6 Cranch, 139.*

If the sale is not to be considered as void in the sense of being a nullity, it is left as merely voidable, and hence sufficient except as against persons in position to complain and who move in season. And when the property has been re-sold to a *bona fide* purchaser without notice, before an attempt to impeach the sale, it will stand, and such purchaser will be protected. This was the doctrine when the legislature transferred the rule, and it belongs to the rule.— *Wyman v. Hooper, 2 Gray, 141; Jackson v. Walsh, 14 J. R., 407; Robbins v. Bates, 4 Cush., 104; Blood v. Hayman, 13 Met., 231; Lessee of Lazarus v. Bryson, 3 Binn., 54; Sweet v. Southcoté, 2 Brown C. C., 66; Lowther v. Carlton, 2 Atk., 242; Brandlyn v. Ord, 1 Atk., 571; Ferrars v. Cherry, 2 Vernon, 383.*

The equity of the *bona fide* purchaser is deemed at least equal to that of the heir or his vendee, and as he holds the formal legal muniment of title, his right is considered superior.—*Hill on Trusts, 504; Tiff. and Bull. on Trusts, 199, 200; Story Eq. J., § 434.*

Whether the plaintiff, who bought of Hamilton, had notice of Hamilton's misconduct, we do not know, and cannot determine. I think, however, it cannot be laid down as a rule of law that he could not hold the character of an honest and fair purchaser, and with the full rights of one buying in good faith and without notice, simply because as matter of fact when he bought the administrator's deed to Minnie had not been put on record. It is not perceived

how that deed, or the record of it, could have shown or suggested the secret collusive arrangement between Hamil-' ton, as administrator, and Minnie: and yet it is in conse-quence of that underground transaction that the title of the plaintiff is sought to be invalidated.   It appears to me that the theory advanced is neither necessary or politic. The law in question rests on particular and on general grounds:    *First,* It aims to protect heirs, and others directly interested in estates, against a specific kind of fraud; and, *second,* as a measure of general policy it would preclude the fiduciary from putting his interest in compe-tition with his duty.

But neither of these grounds is intended to be carried so far as to produce consequences more mischievous than beneficial.

It is in the last degree indispensable to give all reason-able credit and confidence to these fiduciary sales, and to the titles founded on them.    They are a necessity, and their utility, and indeed their very being as practical trans-actions, depends upon the general opinion of their solidity. The law every where recognizes their necessity, and aims to make them eventuate in producing fair values.   A very large number of titles are now held under such sales, and in a course of years the whole real property in the state will rest on titles so derived.    But if every such title, in the hands of a fair and honest buyer without notice of any thing wrong, is to be subject to be overhauled and upset because it can be proved that the official trustee had in fact some secret interest in the sale, a sale judicially con-firmed and apparently legal, the deep and indispensable pol-icy of the law, in favor of these sales and their productive-ness, will be thwarted, if not completely defeated, and a numerous class of blameless persons will be despoiled and injured.

Against public frauds and public misconduct a man may be able to guard.   If the ear-mark of fiduciary misbehavior is borne by the title papers, or by the record, the purchaser

can detect the vice.    But secret collusive arrangements, which leave no sign of irregularity, may baffle the vigilance of the most prudent.    Against such artifices the purchaser cannot guard.    To be safe, a man must refuse every title exposed to such possibilities.

As I see nothing in the statutory recognition of the principle forbidding fiduciary misconduct which implies a design to lessen or impair the rights of honest purchasers, or one looking to any change in the application of the principle itself, I am not ready to assent to the view so strongly set forth by the chief justice.

CAMPBELL, J., concurred.

The court being equally divided on the main point, but all agreeing that no other error was committed, the judgment below was affirmed.