GEORGE S. FROST, CHARLES W. NOBLE ET AL. v. THE MISSIONARY SOCIETY OF THE METHODIST EPISCOPAL CHURCH.

*Quitclaim—After-acquired title—Laches.*

1. A quitclaim deed can never inure to convey any subsequently acquired title not actually owned in equity when the deed was given. But it will convey land thereafter patented if the grantor has already bought and paid for it and obtained a land-office certificate that passes everything but the formal title.

2. Delay of eighteen years in bringing suit to quiet title, when complainant during all that time has known of the defect in it and how to perfect it, would go far to defeat the proceeding, even if based on equity.

Appeal from Chippewa. (Grant, J.) Oct. 15–16.—Jan. 28.

BILL to quiet title. Defendant appeals. Reversed.

*De Forest Paine* for complainants. A quitclaim deed passes inchoate title and a subsequently acquired patent

inures to the grantee's benefit : *Landes v. Brant* 10 How. 348; *French v. Spencer* 21 How. 228 ; *Witherspoon v. Duncan* 4 Wal. 219; where there are divers acts concurrent to make a conveyance or estate the original act shall be preferred and to this other acts shall relate : *Johnson v. Ballou* 28 Mich. 395; *Clark v. West* 23 Mich. 248; *F. & P. M. Ry. v. Gordon* 41 Mich. 430.

*Geo. W. Brown* and *Austin Blair* for defendant.

CAMPBELL, J.   The bill in this case was filed by complainants as grantees of Samuel Whitney claiming as owners in possession of the Mission Reserve near the village of Sault de Ste. Marie, to have their title quieted and a release granted by defendants who hold a government patent.   The equities asserted are all derived from a claim of purchase under contract previous to the patent, whereby it is urged the grant inured to Whitney.   This depends upon a state of allegations to the following effect.

In 1853 defendant by its alleged agent, Rev. James Shaw, a minister under the Michigan Conference, was in possession of the land in question, which was a parcel of 640 acres, fronting on the Little Rapids of St. Mary's river and running back at an angle so as to cover a part of section 16 and some adjoining sections.   This tract had formerly been used as the seat of an Indian mission supported by appropriations from the United States under treaty with the Indians.   At this time the mission had been removed to a point further up the lake, and the property was under lease.   It had never been granted either to the Indians or to any religious body, but had been reserved for occupation for the mission while it lasted.

In 1850 an Act of Congress was passed for settling land claims in that vicinity which included two classes of private claims.   The first class consisted of those acted on by the early Land Commission which sat in 1823 and thereabouts to inquire into the old possessory and proprietary titles at the Sault, whose action had remained unconfirmed by Congress during this long period for reasons not shown by this record and not now important.   The second class of cases included

only recent possessions not based on those older titles, and standing on a footing analogous to that of squatters or settlers. Testimony was to be taken and reports made on these separately and in regard to the latter proper values to be set for pre-emption. Final confirmation was to be had by the Land-office at Washington to which the register and receiver were to make their report.

The same statute required these local officers to receive testimony in regard to any missionary claims and report it to the general Land-office, but no provision was made for grants or confirmations. Under this last enactment various affidavits were filed by the missionaries explaining their former possession.

In 1853 Samuel Whitney had some dealings with Mr. Shaw with a view of getting control of this mission property, and in December, 1853, Mr. Shaw signed a contract which acknowledged the receipt of one hundred dollars towards purchase money, and agreed that Whitney should on payment of $1280, receive a quitclaim deed. It also contained a promise to endeavor to obtain a patent.

The bill asserts (but the proof is otherwise) that Whitney was put in possession, and that he delayed payment because defendant did not get out a patent but that in 1855 a quitclaim deed was executed by defendant, and in the winter of 1856–7 he paid up the balance of the purchase money and the deed was delivered and was recorded soon after. The bill also avers that in April 1853 the defendant's title was confirmed by the register and receiver, but that in 1858 he ascertained from the Commissioner of the general Land-office that there was no law providing for the confirmation of mission lands. Whitney claims it was by his procurement that in 1860 a law was passed providing for such cases and allowing their confirmation. In 1867 Whitney claims that he applied to defendant to correct the old quitclaim which contained no sum of money named as consideration, or to give a new deed, and that he sent his deed to the defendant's officers who never returned or corrected it. In 1879 the Land-office confirmed the title to defendant on payment of $800. This title he claims inures to his benefit.

There are many facts introduced on both sides by way of evidence, but this is the outline of complainant's bill and theory. They claim it was the duty of defendant to pay for and take out the patent, but offer in case the court hold otherwise, to pay the amount.

This last offer, and the rules of law under which it is made, would change the bill from one to quiet title to a bill for specific performance. But as both are made to depend on the same contract relations, no objection is made on that account, and the merits are fairly submitted.

As this contract relation is apparently the condition of relief on any theory, it becomes necessary to determine how far it existed. It becomes all the more important as it appears quite clearly that some portion of the land, at least, is not in complainants' possession, but is occupied by tenants of defendant.

Mr. Shaw admits that the contract bears his signature, but is positive that he never understood that he was attempting to sell any more than the improvements and occupancy, and that he would not have sold title on those terms. He also denies any understanding that steps were to be taken by defendant to perfect the title. And he also denies that he had authority to act for defendant in such stipulations.

It appears clearly that it could not have been understood that he had any such authority. Subsequent communications with Whitney as well as defendant show that it was not until some time after the contract that the defendant's officers consented to make any sale, and they never sent a power of attorney which both Shaw and Whitney desired and expected. A quitclaim deed was sent on in the summer of 1855, to be delivered on payment of the price agreed. There was no other agreement made by defendant, and this deed contained no promises or covenants. It was sent in answer to communications from Shaw in which defendant was informed that the purchaser took all risks, and that there was nothing sold but existing improvements and occupancy, and that in Shaw's opinion there was no probability that the government would ever give the land to defendant; and among other reasons

given were the abandonment of the mission there, and the fact that section 16 belonged to the State of Michigan as school land.

It is impossible to hold on this record that any rights were created against defendant by the contract of 1853. The entire equities as well as legal claims must depend on the quitclaim deed, if that deed was ever delivered, on which there is a conflict.

The complainants to some extent perceiving this difficulty, insist that the patent was merely the consummation of a title that was recognized and reputed in 1853, before the December contract. The circuit judge lays stress on this in his opinion. A careful examination of the record, however, shows that there was no such confirmation in 1853, and that during that year no action whatever was completed, important or unimportant, in the nature of a determination.

The report of Messrs. Brown and Butler, the local register and receiver, dated in April, 1853, strictly conforms to the statute in merely including the showing made for the defendant. There is some difficulty in ascertaining from this record the precise date of the report of their successors, Messrs. Warner and Pratt, which contains a formal attempt to confirm the land to James Shaw in trust for defendant, as the date is omitted from the transcript. But it appears from a recital in later documents that it was not forwarded to the department until as late as September, 1855. This is the first ascertainment of any interest in defendant by a public officer. But until the law of 1860 no such determination was provided for, and the record contains nothing to indicate why the new land-officers assumed any such authority.

It appears that in 1858 Mr. Whitney made some communication to the general Land-office inquiring why the Mission claim should not be confirmed. The letter of Mr. Hendricks, the Commissioner, in answer to this seems to indicate that Whitney did not apply as owner of the claim, but as inquiring in the Mission interest. The Commissioner answered him by saying that the law of 1850 only contemplated the reception of evidence. After the law of 1860 was passed,

Mr. Edmonds, then Commissioner, on July 31, 1862, sent instructions to the register and receiver at Marquette stating that the mission claim seemed to be a good one, which might be confirmed under the act of 1860, and mentioning that the assessment on it was fixed at $800. It was then stated that before final confirmation it was necessary the office should be advised by some action duly verified in what way, by corporate officers or otherwise, the mission title could be properly vested.; and intimated that on receiving satisfactory evidence to that effect the Commissioner would confirm the claim to such person or body, and the land might then be entered on payment of the assessment at the local land-office in Marquette. The register and receiver were directed to notify all parties interested. It does not appear whether they did so. They made no report. The Commissioner sent a copy of this letter of instructions to Mr. Whitney, who does not appear to have taken any steps to have the matter arranged, or to have communicated with the society.

Nothing further was done until 1867, when Mr. Whitney appears to have inquired for the patent at the general land-office in May, and thereupon the Commissioner sent to the Marquette office a copy of the instructions of 1862, asking a report of what had been done and stating none had been received. On May 23 he sent a copy of this letter to Whitney. On the 19th of July, 1867, he further informed Whitney that he had instructed the Marquette officers to report and that when they did so proper action would be taken.

After receiving this last letter, and therefore with full knowledge that there was no confirmation or patent, Whitney wrote to the Methodist Book Concern stating that his quit-claim was defective for want of any sum mentioned as consideration and asking that a new and correct deed should be sent him or a correction of the old one if it could be legally done. In this letter he asks if they have received the patent which should have been sent him five or six years before, which he says has miscarried and may have reached them by mistake. The effect of a new deed might have given him

new rights, and the reference to the patent was a palpable falsehood.

The defendant's officer promised, if the deed should be sent him, to consult the legal adviser of defendant, and if any wrong had been done that it should be rectified. Whitney says he thinks he sent the deed. There is no corroborating testimony, and as no lawyer would probably have advised that the deed was invalid on account of the omission, and as the pretense of the letter was evidently designed to create a false impression concerning the patent, it may very well be doubted whether the purpose of Whitney was not to get an undue advantage. There was no legal or moral obligation resting on defendant under the sale to Whitney or even under the contract of 1853, if valid, to advance any money to buy the government title. Whitney could not help knowing this, and it was his own fault that the claim had not been confirmed and patent issued to the company if he desired it. But the law did not authorize the confirmation or grant to an assignee, and his conduct leads to a strong suspicion that he desired to get the property without personal outlay by waiting for defendant to take it and then setting up a claim to it. He waited between three and four years more without action until September 1870, when he again inquired at Washington, and was again answered that the officers at Marquette had never reported, and again in 1871 was notified that the presiding elder at Marquette had refused to take the land. During all this time it does not appear that he made any application at Marquette, or urged defendant to enter the land. And during all of this period his own agent Mr. Warner with whom he corresponded freely about his land matters was in the county, and was the very land-officer who had reported favorably on this claim in 1855. In 1874 upon his suggesting his claim to have the defendant carry out the contract of 1853 it was at once repudiated.

In spite of this last notice he still waited until 1879 when defendant had the claim confirmed and sued out a patent. Then he set up his present claim and in 1880 transferred his title to some other lands as well as to this, to the parties who

are represented in this suit through some mesne conveyances. His deed purported to be a warranty, but for a nominal consideration of ten dollars, and according to his testimony the various sales do not represent any very tangible value and have no equities beyond strict legal right. The case has been argued as if he had equities of a substantial character.

It has already been said that whatever equities he has arose under the quitclaim. Defendant's present agents having no personal knowledge of the dealings have raised some question concerning the payment of the original consideration. Apart from the presumption derived from the possession of the deed, the testimony is not satisfactory. If the deed was delivered by Mr. Shaw he probably received whatever was paid. His mind is in considerable doubt about it. Whitney's positive statements of paying it personally turn out to be incorrect; and if the case depended on this question it would require very considerable scrutiny.

But a quitclaim deed can never inure to convey any subsequently acquired title which was not actually owned in equity at the time of the deed. Where one has bought and paid for land and obtained a land-office duplicate, that has been held to pass all but the formal title, and a quitclaim therefore may convey the land thereafter patented. That, however, was not the case here. This land was in no sense the property of the Mission and was not claimed to be. The Methodist church occupied it under the government appropriation for the benefit of the Indians and not for their own benefit, and on the removal of the mission it might (except so far as the State of Michigan may have been interested in section 16) have been offered for sale under the land-office regulations by lifting the reservation. The Act of 1850, as already suggested, only provided for making inquiry into the Mission lands. It was not until the Act of 1860 that any beneficial interests were authorized, and these were not donations but pre-emption rights which were granted in respect of mere occupancy in favor of the mission and not of any assignees before entry. The land-office rules required strict inquiry into the title of the corporate officers. Until the claim was perfected by

the recognition by the Commissioner at Washington, and the payment of the assessed valuation, no rights vested in any one which were capable of assignment.

Not only was there no actual transmission of equities, but it is difficult to see any moral claim which Whitney could have set up against defendant upon the land. He had according to his testimony been allowed a deduction for the rents accruing before he made his payment, although they were clearly outside of his contract which made no provision for entry before payment. The land had been made very profitable to the lessees then in possesion, who made $3000 out of it in two years, and who paid a rental of $150 a year besides improving it about $1000. It was evidently desirable for him to delay all action by defendant instead of favoring it, unless he really supposed he was entitled to have defendant buy it for him without further payment, which the record does not indicate to have been the fact. But even if he had such a notion, and it was well founded, the rules of equity require some degree of diligence. Here, with knowledge all the while of the real condition of the title and how it could be perfected, he made no attempt for about eighteen years even to urge action on defendant, and he made no offer or attempt to procure confirmation. It was only when the defendant, after this long interval had purchased and paid for the land which he had so long claimed the enjoyment of that he set on foot this attempt to appropriate it to his own purposes. Had his original equities been real and legally appreciable, this long delay would have stood very seriously in the way of enforcing them. But he had neither legal nor equitable claims against the property, and its enhanced value, after so many years, may fairly be deemed the inducement for the present experiment. We make no comment on his testimony, which is peculiar and inconsistent, because we can discover no foundation at all for his pretensions. His grantees cannot be in any better legal position than he is, and can have no stronger claims on a court of equity. The case made by the bill fails, and on the facts none could be made by any different frame of pleadings.

The decree below must be reversed and the bill dismissed with costs of both courts.

COOLEY, C. J. and SHERWOOD, J. concurred.

CHAMPLIN, J., dissenting. My investigations of the facts of this case lead me to a different conclusion from that expressed by my brethren. The defendant is a corporation existing under and by virtue of the laws of the state of New York. Although there is nothing in the record before us to show that such corporation is endowed with authority to purchase, hold or convey real estate, yet as no question is made upon that point, and as both parties have treated it as having that capacity, I shall consider that fact as if proved. The Missionary Society of the Methodist Episcopal Church was organized in 1819, and immediately commenced its missionary work, not only in foreign lands but among the Indian savages upon the frontiers of our own country. In the labor of domestic missions it operated mainly through the general conferences of that church. As early as 1833, John Clark, as a superintendent of missions of the Methodist Episcopal church, went among the Chippewa Indians, then in the vicinity of the Sault Ste. Marie.

By the fourth article of the treaty made between the United States government and this tribe of Indians at the Fond du Lac of Lake Superior in August, 1826, it was stipulated that the sum of $1000 should be annually appropriated to the support of an establishment for the education of Indian youths to be located upon some part of the St. Mary's river, the money to be expended under the direction of the president, and a section of land was granted for the accommodation of the school; and in 1836 a treaty was concluded at Washington between the general government and the Ottawa and Chippewa tribes, in which certain territory is ceded to the United States, and by the third article of which is reserved for the Chippewas "six hundred and forty acres at the mission of the Little Rapids," for the term of five years from the date of the ratification of the treaty, and no longer, unless the United States granted permission for them to remain on said lands for a longer period; and by the second clause of article 4, the United States engaged to pay an

annuity of $5000 for the purposes of education, teachers, school-houses and books in their own language, to be continued twenty years and as long thereafter as Congress might appropriate for the object; and also, subject to the same conditions, to pay an annuity of $3000 for missions.   There were several of these missions, so that the amount received by each was about $1400 annually, and it continued to be paid until 1856.   The annuity which was paid to support the mission of the Methodist Episcopal church at Sault Ste. Marie came through the defendant, and was by it forwarded to the Michigan conference, which body had the superintendence and labor of the mission under its immediate charge. John Clark, as superintendent of said mission, in 1833 made improvements upon the land, and erected thirteen dwellings and a school-house, and in 1845, when Mr. John Mullett, the United States surveyor, made the government survey, he found the property occupied as a mission, and accordingly surveyed out the six hundred and forty acres in question, and returned it as a missionary reserve.   It was occupied under the supervision of the Michigan conference of the Methodist Episcopal church until 1850 or 1851, when the mission and school were removed to Neomacong, about thirty-five miles distant above the Sault.

At this time the improvements consisted of a large opening or clearing of between fifty and sixty acres under improvement, inclosed by a fence, a mission-house, a log school house, a wood-shed, a barn, a little building for storing flour, a brick bake-oven, and not less than ten or a dozen Indian cabins along the shore.   Nearly all of these buildings had been erected as early as 1844.   In 1852 Rev. James Shaw was sent by the Michigan conference to the mission as superintendent.   He found the Indians had removed to Neomacong. This was not unknown to the Michigan conference, for it had authorized a sale of the improvements as early as 1850, by the passage of the following resolution :   "Resolved that the interests of the missionary cause would be subserved by selling the improvements on the mission farm at Sault Ste. Marie, and applying the proceeds of the same to making

improvements at Neomacong." This resolution was for.
warded to defendant in New York, and was approved by its
board ; and the predecessor of Mr. Shaw, the Rev. J. H.
Pitezel, then in charge at the Sault, was informed according-
ly and that he was authorized to dispose of the property,
He did not do so, however, and Mr. Shaw later found a
purchaser in Mr. Samuel Whitney ; and on December 3, 1854,
signed the following :

"SAULT STE. MARIE, December 3rd, 1853.

Received from Samuel Whitney on account of purchase
money for the property known as the Methodist mission
property, in this town, $100, for which property I hereby
agree to make to the said Samuel Whitney or his assigns a
quitclaim deed, as soon as the same can be procured from
the Methodist mission board, whose agent I am in the sale
of this property, and to whom it now belongs. And it is
hereby agreed that the mission board shall use all proper
exertions to obtain at the earliest possible date a patent for
the aforesaid property from the United States government.
The number of acres in said property is 640 acres ; the con-
sideration for the same is $1280.

$100.                          JAMES SHAW,
                  Superintendent Lake Superior District.
Witness :   C. F. LOOMIS."

On January 14, 1854, Mr. Shaw wrote to Rev. T. Carlton,
who was the treasurer of the missionary board at New York,
the following letter, viz. :

"SAULT STE. MARIE, January 14th, 1854.

"*Rev. T. Carlton*—DEAR BROTHER : I have just received
a letter from Br. Terry in answer to one I sent you, in which
I asked for power of attorney to sell our claim to property at
Little Rapids. He says that by referring to Dr. Durbin's
letter he finds that our title to the farm at Little Rapids is
not yet established. I supposed that was perfectly under-
stood. We have no title to the farm, nor shall we ever get
one (in my opinion). There are several difficulties in the
way : *first*, we never had a word in writing authorizing us
to settle on and improve the land ; *second*, the mission has not
been within forty miles of the farm for years ; *third*, the
school section owned by the State cuts right through it, and
takes the largest share of it. Now, I have an opportunity

of settling our claim and giving a quitclaim deed, and the man to run his own risk as to the title, who understands all about the situation of it. I am sorry you did not send my power of attorney. Should we run any risk in giving a quitclaim deed? I think we had better by all means sell. As it is, it requires a good deal of trouble to look after it. Then the improvements are fast going to ruin. The rent, will hardly keep up the proper improvements. I can sell for $1280, which amount, if laid out for land and improvements, where the mission now is, would be worth at least four times as much to the society. Please write me immediately, as letters are a long time reaching this place at this season of the year.

Yours, etc., JAMES SHAW."

. On February 15, 1854, Mr. Shaw gave to Mr. Whitney the following receipt, viz.:

"SAULT STE. MARIE, February 15, 1854.

"Received from Samuel Whitney two hundred and fifty dollars, as part payment on account of purchase of property known as 'Methodist Mission Claim.'

$250.00. . JAMES SHAW."

And on December 16, 1854, he wrote and sent to Mr. Whitney the following letter, viz.:

"IROQUOIS, December 16, 1854.

*Mr. Whitney* — SIR: I have been corresponding with missionary board in regard to my selling our claim to the farm at Little Rapids. They have withdrawn their opposition, and left the matter in my hands to dispose of as I agreed with you. I should be glad to close the matter as soon as possible, as I need the money to carry out improvements I have commenced here. Please write me as soon as convenient. Have you any agent at the Sault? To whom shall the deed be made out? I am sorry that I had not got the letter from the board before you left, but all things are now right.

I remain yours, &c., JAMES SHAW."

Soon thereafter the defendant sent to Mr. Shaw a quitclaim deed, but without any consideration being named therein, a certified copy from the record thereof being as follows:

"Received for record the 17th day of July, A. D. 1857, 2 o'clock P. M.

C. W. HATCH, Deputy Register.

This indenture, made the 21st day of May, in the year of our Lord, 1855, between the Missionary Society of the Methodist Episcopal Church, an incorporation created by the laws of the state of New York, of the first part, and Samuel Whitney, of Sault Ste. Marie, Chippewa county, Michigan, of the second part, witnesseth : That the said party of the first part, for and in consideration of the sum of        dollars, lawful money of the United States of America, to them in hand paid by the said party of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, have remised, released, and quitclaimed, and by these presents do remise, release and quitclaim, unto the said party of the second part, and to his heirs and assigns, forever, all that tract of land described upon the map of the United States survey of township forty-seven north, of range one east, Chippewa county, Michigan, as made by John Mullett, deputy surveyor, and known heretofore as the mission reserve, containing six hundred and forty (640) acres of land, more or less, and lying within the land district, the land-office for which is located at Sault Ste. Marie, Michigan, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, issues and profits thereof, and all estate, right, title and interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part of, in, or to the above-described premises, and every part and parcel thereof, with all the appurtenances, to have and to hold all and singular the above-mentioned and described premises, together with all the appurtenances, unto the said party of the second part, his heirs and assigns forever. In witness whereof, the said party of the first part have hereunto set their corporate seal the day and year hereinabove written, and has caused these presents to be subscribed by its treasurer in pursuance of the resolution of its board of managers.

THOS. CARLTON,

Treasurer of the Missionary Society of the Methodist Episcopal Church.

[Seal.]

Sealed and delivered in the presence of

DAVID DURHAM, Jr.

Z. PHELPS.

*State and County of New York—ss.:*    On this 30th
day of June, A. D. 1855, before me personally came Thos.
Carlton, the treasurer of the Missionary Society of the Meth-
odist Episcopal Church, who is personally known to me to be
the individual described in and who executed the within con-
veyance, and who acknowledged to me that he had executed
the same for the purposes therein mentioned.

                         JOHN M. EAGEN,
Commissioner of Deeds within and for the State of Mich-
     igan in the State of New York.

*City of New York, State and County of New York—ss.:*
I, Richard B. Connelly, clerk of the city and county of New
York, and also clerk of the supreme court for said state and
county, being the court of record, do hereby certify that J.
M. Eagen, whose name is subscribed to the certificate and the
proof of acknowledgment of the annexed instrument, and
therein written, was, at the time of taking said proof of
acknowledgment, a commissioner of deeds for the said county
and city, dwelling in said city, commissioned, sworn and duly
authorized to take the same ; and further, that I am well
acquainted with the handwriting of said commissioner, and
verily believe that the signature to the said certificate of the
proof of acknowledgment is genuine.    I further certify that
said instrument is executed and acknowledged according to
the laws of this state, as appears by said certificate.

In testimony whereof, I have hereunto set my hand and
affixed the seal of said court and county, the 30th day of June,
A. D. eighteen hundred and fifty-five.

                         RICHARD B. CONNELLY, Clerk."

After Mr. Shaw received the deed from defendant, he noti-
fied Mr. Whitney that he was ready to receive the balance of
the purchase price and deliver the deed ; also informing him
of the urgent need he had to use the money ; and on October
2, 1855, wrote him as follows:

                    SAULT STE. MARIE, October 2nd, 1855.

" *Mr. Samuel Whitney*—DEAR SIR :    I came to the Sault
on purpose to see you, but arrived a little too late.  I am very
anxious to have the matter of the Little Rapids farm closed
immediately.    I have contracted debts on the strength of the
avails of that farm ; those debts must be paid immediately.
If you cannot pay the money immediately, do you wish to
give up the matter and take back your money.   If the matter

was settled I could get money from the missionary society, but cannot as it is, and my matters are very pressing. I hope we can settle the matter immediately, either by consummating the trade or compromising without cost.

Please write me immediately or see me. I would not be so urgent but from necessity.

Yours, &c.,          JAMES SHAW."

It appears that Whitney replied November 7, 1855, but the letter is not produced; and June 7, 1856, Mr. Shaw writes him again as follows :

"SAULT STE. MARIE, June 27th, 1856.

*Mr. Samuel Whitney*—DEAR SIR : I received yours of November 7th, 1855, but by some means laid it aside, so that I lost the place of your address. I spent the winter in Detroit, and expected to meet you there in May. I came up here not knowing where to address you. I waited, expecting to meet you here, probably. I have just found your letter among my papers and hasten to reply. I shall be in Detroit several days between this and the 10th of July. Please address me there; perhaps you can call on me. I live on Henry street, between Woodward ave. and Park street. I have the deed for you, and am in great need of the money.

Yours, &c.,          JAMES SHAW.

P. S. I have just learned that you moved in Toronto. Please write at Detroit immediately on the reception of this.          J. S."

Failing to obtain payment of the purchase money, Mr. Shaw wrote Mr. Whitney, August 13th, 1856, as follows :

"SAULT STE. MARIE, August 13, 1856.

*Mr. Samuel Whitney*—SIR : Whereas, by an agreement between you and myself to meet at this place the first day of Aug. to complete and settle up the contract for the sale of the mission farm at Little Rapids ; and whereas, I was here at the time, and have been ready and waiting to fulfill on the part of the missionary society, and you have failed to meet me and your engagement: I therefore hereby notify you that I consider the agreement violated, and the society no longer bound by any instrument between you and me as their agent.

Yours, etc.,          JAMES SHAW.

Superintendent of Indian Missions, Lake Superior Dist."

This seems to have had some effect upon Mr. Whitney, for he both wrote and telegraphed Mr. Shaw, and the result was

that an appointment was made to meet in Detroit to adjust the matter, and the testimony shows that they did meet in Detroit and tried to agree upon the balance to be paid by Whitney on the purchase. Whitney claimed that he should be allowed the amount which Shaw had received for rent for the use of the property after December 3d, 1853, which claim Shaw did not accede to. Whitney made out a statement of account, showing the balance due to be about $730. This account Mr. Shaw forwarded to defendant, at New York, for their approval or rejection. Defendant approved the account as stated by Mr. Whitney, and directed Mr. Shaw to settle and close the matter up according to such statement. This was the latter part of November, 1856. I think the payment of the purchase money and the delivery of the deed are established by the evidence. The time and manner of pay- ment, and the delivery, are not supported by evidence of the most satisfactory nature. The testimony bearing upon these questions, after the great length of time which has elapsed, is not as certain and specific as could be wished, but, per- haps, as much so as could be expected. Mr. Shaw has an impression amounting to a conviction, that the balance of the purchase money was paid. He thinks he met Mr. Whit- ney in Detroit in the fall of 1856. He is quite sure he would not have delivered the deed if the balance of the considera- tion had not been paid. Yet he has no definite recollection of receiving it, or by whom it was paid, if he did receive it. Mr. Whitney is positive he paid it, but how, or when, or where, or by whom, he is unable to state. He says he met Mr. Shaw in Detroit in the fall of 1856, for the purpose of closing the matter up, and there made out a statement of the account, which Mr. Shaw did not feel authorized to accept, and that Mr. Shaw forwarded the same by letter to defend- ant, under date of November 20th, 1856, and that defendant replied about November 28th, directing Mr. Shaw to settle according to the figures made by Mr. Whitney; that he obtained these dates and facts as to contents of the letters from the letter and letter-book in the possession of defend-

ant, which were shown to him by the officers or agents of defendant.

In connection with the testimony of Mr. Shaw and Mr. Whitney, the surrounding circumstances and action of the parties subsequently are quite conclusive to my mind as establishing the fact of payment. Mr. Whitney went into the possession of the property and leased it, and received the rents. It is very unlikely that he would have been permitted to have done this if he was still in arrear for the purchase money. The demands for payment of the balance of the purchase money up to this time had been quite frequent as well as urgent, yet after the year 1856 no claim was made for payment, and no demand of possession from Whitney, and no complaint made that he was in possession, receiving the rents and profits without right. It is not probable that the defendant, or its more vigilant auxiliary, the Michigan conference, who had the supervision of this mission, would have lain by and allowed Mr. Whitney to appropriate the rents, and have the use of the property sold year after year, if the claim against Mr. Whitney had not been satisfied. The delivery of the deed was also evidence that the considertion was paid.

The defendant insists, however, that because no consideration is named in the deed, the burden of proof is upon the complainants to establish the consideration and the payment thereof. Such, however, is not the law. The burden of proof is upon the party who sets up the defense of want of consideration, to make it out by clear proof. *Stuart v. Phelps* 39 Iowa 14; *Feldman v. Gamble* 26 N. J. Eq. 494; *Brigham v. Potter* 14 Gray 522. The instrument was under seal, which is presumptive evidence of a consideration, although none was named in the deed. It imports a consideration, and cannot be avoided merely because it mentions none. *Stearns v. Barrett* 1 Pick. 449; *Bowen v. Bell* 20 Johns. 338; *Parker v. Parmele* id. 130; *Frink v. Green* 5 Barb. 455; *Boynton v. Rees* 8 Pick. 332; *Jack v. Dougherty* 3 Watts 151; *Den v. Ogden* 4 Wash. C. C. 139; *Briggs v. French* 2 Sumn. 251; *Farnum v. Burnett* 21 N. J. Eq. 87.

The testimony bearing upon the subject of delivery shows
that Mr. Shaw had the deed in his possession ready to be
delivered on payment of the balance of the purchase money
in 1856. Mr. D. Bethune Duffield was attorney for Mr.
Whitney at that time, and in 1857. He testifies that he re-
ceived the deed for Mr. Whitney from some person prior to
January 15, 1857, and forwarded it for record. It appears
to have been recorded July 17, 1857. Mr. Whitney went to
Europe in July, 1857, and returned in August, 1858, and
then found the deed among his papers. These facts are pre-
sumptive evidence of the delivery of the deed, arising from
the presumption that all things are legally and properly
in their existing state until the contrary is shown. In
*Patrick v. Howard* 47 Mich. 40, it was held that delivery
of a deed will be presumed from its having been executed,
acknowledged and recorded, and by possession of the grantee
under it, unless there are facts which repel such presumption.

In this case there are no facts which repel the presumption
of delivery. The grantee is shown not only to have had
possession of the deed, but also possession of the land granted,
and treated and used it as his own. He paid the taxes on it ;
occupied it by his tenants, and in 1861 executed a mortgage
thereof to William Moses, which was recorded on the 28th
of February of that year. Later, in the month of July, 1867,
he wrote to the managers of the New York Methodist Book
Concern, stating that some years before he had purchased
from the Rev. Mr. Shaw the Methodist mission property at
Sault Ste. Marie, for the sum of $1280, which he had paid
him for, and received the deed subsequently from the hands
of his counsel at Detroit ; that recently, in referring to the
deed, he observed that by some unaccountable neglect the
price or consideration had been left out of the deed, and it
was duly recorded, and asking the society to make out a new
and correct deed, or to correct the old one, if it could be done
legally, at his expense ; and asking also if, by mistake, the
society had received the United States patent which should
properly have been sent to him. He received a reply from
the assistant corresponding secretary, in which no mention is

made of the patent, but stating that, if he would return the deed to them, they would submit it to their counsel to see in what way its defects could be cured, and whatever was in the power of the society to do, to rectify an error of the past, he had no doubt would be cheerfully and promptly done. There was no evidence introduced by the defendant to rebut in any respect these facts and circumstances, and under the testimony, the payment in full of the consideration and the delivery of the deed must be considered proved.

In 1850 the Congress of the United States passed an act entitled "An act providing for the examination and settlement of claims for land at the Sault Ste. Marie, in Michigan," approved September 26, 1850. It authorized the register and receiver of the Land-office at Sault Ste. Marie to examine and report upon the claims, the estimated value at the settlement, the present value exclusive of improvements, the value of the improvements, etc., and section 4 of the act reads as follows :

" Sec. 4. *And be it further enacted*, That in the case of any bona fide claimant, who has no right under an original claim, entered in the aforesaid book number seven, but who, on the first day of January, in the year of our Lord eighteen hundred and forty-nine, had reduced a lot into possession, and is an actual and bona fide settler thereon, or occupant thereof, it shall and may be lawful for him to file a *sworn* notice, stating how long he has been in the actual possession of the lot, the nature of his improvements, the extent of front and depth requisite to embrace his actual settlement and improvements, the estimated value of the lot at the time of his settlement, and its present value, exclusive of improvements, as also the value of such improvements, and also designating, as accurately as practicable, its position upon the public surveys; and it shall and may be lawful for the aforesaid officers, also, to take all necessary testimony in this class of cases in like manner, and perform similar duties as required in the foregoing section, and to receive any notice and evidence of any *missionary claim* from any party authorized to act, both as to the nature and extent of the same, and the grounds on which it may be entitled to equitable consideration."

The 8th section provided for the confirmation of the

reports by the Commissioner of the general Land-office, whose decision should be final, and who might authorize the register and receiver to grant a certificate upon the cash payment, to the receiver, of what might be determined to be a fair assessment on the lot confirmed ; and upon such payment being made, and a return of the certificate to the general Land-office, a patent should issue.  9 U. S. Stat. at Large, 469.  Under the authority of this act, on the 24th of September, 1851, Rev. J. H. Pitezel, the superintendent then in charge of the Methodist mission at the Sault, filed a notice of claim in behalf of the Missionary Society of the Methodist Episcopal Church, with the register and receiver.  Proofs were brought forward in support of the claim on the 19th and 22d days of January, and on the 29th day of March, 1853, and report was made thereon by the register and receiver, April 4, 1853, and transmitted to the general Land-office, April 14, 1853.  This claim they assessed at the sum of $1.25 an acre, making $800 for the tract claimed.  Thus it is seen that proceedings had been instituted under authority of law to establish a claim to this six hundred and forty acres of land by the Missionary Society when the sale was made to Whitney on December 3, 1853.  The Commissioner of the general Land-office did not confirm the claim of the Missionary Society, because he did not think any authority was conferred by the Act of 1850 for him to do so, and decided that further legislation was necessary.

The defendant made no application to Congress for further legislation, and Whitney made no request of defendant to obtain a patent until 1874, when it denied any agreement or duty so to do.  November 8, 1858, Whitney applied to the Commissioner of the general Land-office, and requested to be informed what difficulty, if any, existed to prevent the confirmation of the missionary claim at Sault Ste. Marie, and was informed by the Commissioner that the Act of 1850 only required the register and receiver to receive notice and evidence of any missionary claim, as to the nature and extent of the same and the grounds upon which it may be entitled to equitable consideration, and this provision was not construed as authorizing a confirmation, and that further

legislation was necessary. In 1860 Congress passed an Act entitled " An Act in relation to mission claims at Sault Ste. Marie, Michigan," by which it was enacted that the missionary claims referred to in the fourth section of the Act of. the 26th of September, 1850, and reported upon by the register and receiver pursuant to said Act, shall be entitled to recognition and confirmation in the same manner and upon the same terms as claims for individuals therein provided for, and upon the final approval of said claims, as provided in the eighth section, a patent shall issue therefor. Mr. Whitney testifies that he was instrumental in obtaining the passage of this law. The Commissioner of the general Land-office, on July 31, 1862, sent instructions to the register and receiver to notify parties interested that, upon payment of the assessment of $800, the paten' would be issued, and on the same day enclosed a copy of such instructions to Mr. Whitney. So far as the record before us shows, nothing further was done with reference to obtaining a patent until May 16, 1867, when Mr. Whitney again addressed the Commissioner, who, on May 23d, 1867, requested the register and receiver to report full particulars of the matters referred to them in the letter of July 23, 1862, and a copy of the letter was enclosed to Mr. Whitney the same day, who, on the 15th of July, 1867, made inquiry of the Commissioner, and he replies to Mr. Whitney, July 19, 1867, that no report had been received. Mr. Whitney called personally on the Commissioner in September, 1870, and is notified by the Commissioner, September 11, 1870, that he has again called on the register and receiver for a reply to the letter of July 31, 1862. The Commissioner again wrote Mr. Whitney, under date of April 20, 1871, that the register and receiver report " that the ' Methodist Episcopal Mission ' through their presiding elder for the Lake Superior district of the M. E. church, has notified this office that they do not wish to take said claim at the assessment fixed by act of Congress—eight hundred dollars."

No further action was taken' toward getting a patent from the United States until 1878, when the defendant applied

therefor. On December 3d, 1878, precisely twenty-five years after the written receipt from Shaw to Whitney, the claim filed in 1851 in behalf of defendant was finally confirmed by the Commissioner of the general Land-office, as appears from the following record in that office, viz. :

"December 3, 1878.

The decisions of the register and receiver at Sault Ste. Marie, Michigan, in their report, under act of September 26, 1850, on the claims embraced in the following list, No. 6, are hereby affirmed, and said claims are hereby finally confirmed, subject to the payment of the respective assessments, as in said list specified, each with areas as shown upon a connected plat of survey made in 1855 by Thomas Wheepley, deputy surveyor, pursuant to said act of September 26, 1850, except the claim of the Missionary Society of the Methodist Episcopal Church, whose area as herein confirmed is shown by a survey executed in 1845 by John H. Mullett, as it is laid down on the official township plats of sections nine, sixteen, and twenty-one, in township forty-seven north, of range one east, in the State of Michigan, on file in the general Land-office. J. M. ARMSTRONG, Acting Commissioner."

The claim of the Missionary Society of the Methodist Episcopal Church was designated in list No. 6 as claim No. 153, and the same day it was confirmed the Commissioner notified the register and receiver, and instructed them to notify the parties interested, to come forward and pay the assessment, and, on such payment being made, to issue a patent certificate subject to the payment of the assessment of $800. This certificate they issued in February, 1879, to defendant, and therein stated that it had made full payment of the assessment, and on May 13, 1879, a patent based thereon was issued by the United States to the defendant and its successors and assigns, which was duly recorded in the register's office of Chippewa county on the 6th day of June, 1879. This patent, by its recitals, refers to the Acts of Congress above mentioned, and to the claim made by the defendants and to the report of the register and receiver thereunder.

At the time Shaw made the agreement to sell to Whitney in 1853, the property was under lease to Spaulding &

Childs, at a rental of $150 a year, and some other privileges and services not necessary to mention. This lease terminated April 1, 1857. Spaulding testifies that when he rented the premises the improvements were not worth over $300, and that he put on improvements to the value of $1000, and that at the expiration of his lease the rental of the place was fully worth $300 a year. Edward Bernier was the next tenant in possession. He went in under Whitney, and remained his tenant for many years; how long does not satisfactorily appear from the record. The testimony shows, however, that the improvements on the place were not kept up. The buildings were either removed, or suffered to go to ruin. Mr. Spaulding testifies that at the time of his examination none of the buildings which were on the place at the time he rented it then remained, except that part of the barn which he built. After defendant obtained the patent in 1879, it sent an agent to the Sault, who found one Louis Bernier in possession of a portion, under some claim by virtue of a tax title, but who yielded possession to defendant, who thereupon put a tenant in possession, who cultivated and cropped a portion of the premises; and defendant, by its tenants, retained possession of such portion, being in the neighborhood of seventy acres, and claiming possession and ownership of the whole at the time of the commencement of this suit, in 1882.

On the 25th of June, 1880, Mr. Whitney, by a deed containing full covenants of warranty, conveyed the land in dispute to Charles B. Colton and Lester A. Rogers, of Brooklyn, New York, and on August 17, 1880, these parties conveyed by deed, without covenants of warranty, to D. Bethune Duffield, who, by Henry W. Lord, his attorney in fact, leased the premises to George Bernier on the 13th day of June, 1881, who went into actual occupation of the northern portion of the tract, moved a house thereon, and has since resided therein and cultivated a portion of the premises in dispute. The complainants claim through several conveyances of undivided interests from Duffield, and were in the actual possession of a portion of the premises, claiming title to the whole,

at the time they commenced this suit. Their entry appears
to have been peaceable, and their occupation unmolested.

The bill of complaint states that defendant, by its contract in
writing executed by said Shaw in its behalf, and by its quit-
claim deed of said land executed and delivered to Samuel
Whitney, and the receipt of the purchase money for said
lands, is estopped to deny the title of complainants to said
lands under the deed and contract, and from asserting title
thereto under said patent against them; that the making and
filing of said notice and claims with the register and receiver
under said law was the commencement of title to said prop-
erty, and the patent relates back to such notice and claim,
and, as to complainants, must be taken to bear date as of the
filing of said notice. And the prayer of the bill is that
defendant may be decreed to release to complainants what-
ever interests it may have acquired in such land under and
by virtue of the patent, and, so far as said agreement has not
been performed, to specifically perform the same; and for
general relief.

The facts constitute no case for specific performance. · If
it should be conceded that the defendant was bound to obtain
a patent from the United States government by the writing
of December 3, 1853, everything contained in that writing ·
was fully performed by defendant before this suit was
brought. But I do not think the defendant was under any
obligation to obtain a patent. The defendant denies that
Shaw was ever authorized to enter into any agreement bind-
ing the missionary board to use all proper exertions to obtain
at the earliest possible date a patent for the land from the
United States government. It was incumbent upon the com-
plainants to prove the authority of Mr. Shaw to bind them by
such agreement. The writing itself is no evidence of such
authority. The defendant produced Mr. Shaw, and he testi-
fies he had no such authority. The writing signed by him
remained in the hands of Mr. Whitney, and there is no evi-
dence that defendant ever knew of such written agreement
with reference to the patent until 1874, when it promptly
repudiated it. The letter from Mr. Shaw to Mr. Carlton, of

January 14, 1854, shows conclusively that they were not informed about such clause in the agreement; on the contrary, it negatives any inference that might be drawn, that any such information had been given, by expressly stating that he had an opportunity of selling " our claim and giving a quitclaim deed, *and the man to run his own risk as to the title, who understands all about the situation of it.*" It was upon this information defendant acted in giving the deed, and it had no knowledge or information that the paper writing of December 3, 1853, existed, or of its contents. The defendant cannot, under such circumstances be held to have ratified Mr. Shaw's agreements any further than it was informed of the engagements made by Mr. Shaw at the time it executed the quitclaim deed. The effect of the information given in 1874 as to the agreement to obtain a patent will be considered further on.

At the time the quitclaim deed was executed and placed in the hands of Mr. Shaw, to be delivered on payment of the balance of the purchase money, the Methodist Missionary Society had property which was the subject of sale. It had the improvements which it had made on the land, consisting of buildings and clearings. It had the possession and enjoyment of the tract of land described in the government survey as the " Missionary Reserve," which was good against all the world, except the United States, who was the holder of the legal title. It had an inchoate right to obtain the legal title, based upon the claim and proofs made under the Act of 1850, which had been reported upon favorably by the register and receiver, which showed the grounds upon which its claim to equitable consideration was based, and which, in contemplation of the parties, might ripen into a title from the government. It was the intention of the parties that the quitclaim deed should convey something more than the improvements upon the land, and the possessory rights of defendant. It conveyed the land *as land*, and described it with sufficient particularity, and stated the quantity to be six hundred and forty acres. It also conveyed "all the estate, right, title, interest, property, possession, claim, and demand

whatsoever, as well in law as in equity," of the defendant to
the premises. The consideration paid was the full value of
the land with all the improvements, subject to the assessment
laid thereon by the register and receiver in said report. The
register and receiver say in their report: "The land is not
valuable, and were it not for the improvements made thereon
by the Missionary Society, would, taking the whole body,
hardly bring anything more than one dollar and twenty-five
cents per acre." Mr. Spaulding testifies that the improve-
ments when he leased the premises in February, 1853, were
not worth over $300.

The intention of Mr. Whitney, as shown by the language
of the receipt, wherein the defendant was engaged to use all
proper exertions to obtain a patent, at the earliest possible
date, from the United States government, indicates very
clearly that he was negotiating for something more than the
mere improvements; and Mr. Shaw's intention is indicated
with equal certainty in the letter to Mr. Carlton that Mr.
Whitney was purchasing with the view of obtaining through
defendant the legal title. And it must be kept in mind that
the only way then open for obtaining a title was through the
claim of the defendant, as a missionary society under the
legislation of Congress; and if any title was ever obtained, it
must be by virtue of the steps which had then been taken
under the claim proved, and in the name of the society.
Although the deed did not contain the words "bargain and
sell," yet it being in the form in common use in this State
was sufficient to pass all the estate which the grantor could
lawfully convey by a deed of bargain and sale. How. Stat.
§ 5653; *Hoffman v. Harrington* 28 Mich. 103; *Kitchell v.
Mudgett* 37 Mich. 84. Had it assumed to convey only the
right, title and interest which the Missionary Society held at
that time in the mission reserve, there would have been
nothing, looking to the face of the deed alone, to prevent the
defendant from acquiring an outstanding title, and asserting
it in opposition to the deed. *Eaton v. Trowbridge* 38 Mich.
454; *White v. Brocaw* 14 Ohio St. 343; *Adams v Ross* 1

30 N. J. Law 509; *Miller v. Ewing* 6 Cush. 34; *Frink v. Darst* 14 Ill. 304.

It is true that the defendant entered into no express covenants for title in the deed; and it has sometimes been held that where there are no covenants a grantor by quitclaim is not prevented from acquiring a title in opposition to the deed. *Sparrow v. Kingman* 1 Comst. 242; *Pelletreau v. Jackson* 11 Wend. 110; *Jackson v. Wright* 14 Johns. 193 are of this character. They are based upon the principle that a sealed instrument shall not be contradicted by any evidence of less solemnity than its own. The operation of a deed must be determined from its language; but what it is to operate upon may be gathered from the whole field of parol evidence, and contemporaneous acts and surrounding circumstances may be appealed to, in order to shed light upon the intention of the parties. The subject-matter of the grant, and the relation of the grantor thereto, may be such as to effectually estop him from acquiring an outstanding title, although the deed contains no covenants of warranty. *Landes v. Brant* 10 How. 348; *Van Rensselaer v. Kearney* 11 How. 297; *Stoddard v. Chambers* 2 How. 316; *Bissell v. Penrose* 8 How. 317; *French v. Spencer* 21 How. 228; *Flint & P. M. Ry. Co. v. Gordon* 41 Mich. 430; *Fisher v. Hallock* 50 Mich. 463.

In the case of *Landes v. Brant*, one Clamorgan, on December 10, 1805, presented a claim, under an Act of Congress, to certain land, to the board of commissioners to decide on land claims under an Act of Congress. The claim was acted upon in 1811, and a certificate issued, bearing date November 13th of that year. The survey was to be made at the expense of the United States, which was done in 1826. After the papers were filed, upon which the claim of Clamorgan was founded, and before the confirmation or issue of patent, the land was levied upon by a judgment creditor of Clamorgan and sold. The claim was confirmed in 1811, and the patent issued in 1845. The plaintiff claimed under the patent, and the defendant under the execution sale. The court held that the sheriff's deed passed to the purchaser all the title that would have

passed from Clamorgan had he made a quitclaim deed to the purchaser, and the only question was whether the sheriff's deed could be set up as a defense at law, notwithstanding the confirmation and patent, both of which were of date subsequent to that of the sheriff's sale and deed. Clamorgan's claim to the land sold had existed for many years before the United States acquired Louisiana. It had been regularly surveyed by order of the Spanish government, and filed according to the Act of 1805, and this the court regarded as the first act of Clamorgan in acquiring title; and Mr. Justice Catron, speaking for the court, says: "The imperfect title, as then filed, was subject to seizure and sale by execution; the ultimate perfect title demanded and granted was a confirmation and sanction, by the political power, of the imperfect title, and gave it complete legal validity; and to protect purchasers the rule applies that where there are divers acts concurrent to make a conveyance, estate, or other thing, the original act shall be preferred, and to this the other acts shall have relation, as stated in Viner's Abr. tit. 'Relation,' 290." He also cites 5 Cruise on Real Property 510, 511, and says the author lays down the rule with great distinctness. He says: "There is no rule better founded in law, reason, and convenience than this, that all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation." And the court applied the doctrine of relation and said: "Taking all the several parts and ceremonies necessary to complete the title together as 'one act,' then the confirmation of 1811 and the patent of 1845 must be taken to relate to the first act,—that of filing the claim in 1805. On this assumption, intermediate conveyances made by the confirmee, or by the sheriff on his behalf, of a date after the first substantial act, are covered by the legal title, and pass that title to the alienee."

This doctrine was approved and applied in *French v. Spencer*, in a case of bargain and sale, without warranty, of land located under a warrant issued to a Canadian volunteer under an Act of Congress of 1816, before the patent issued. The court said: "It is also the settled doctrine of this court that

an entry in a United States land-office, on which a patent issues,—no matter how long after the entry is made,—shall relate to the entry, and take date with it. *Ross v. Barland* 1 Pet. 655. The fiction of relation is that an intermediate bona fide alienee of the incipient interest may claim that the patent inures to his benefit by an ex post facto operation, and receive the same protection at law that a court of equity could afford him."

In *Van Rensselaer v. Kearney* the court deduced the principle from the authorities to be, that " if the seizin or possession of a particular estate is affirmed in the deed, either in express terms or by necessary implication, the grantor, and all persons in privity with him, shall be estopped from ever afterwards denying that he was so seized and possessed at the time he made the conveyance. The estoppel works upon the estate, and binds an after-acquired title as between parties and privies." In that case there was no warranty and no express recitals or representations that the grantor had or held any particular estate in the land; but the court implied such assertion from the granting words of the deed, and from the surrounding facts and circumstances derived from the antecedent contract, and from other grants and reservations in the deed. The doctrine of relation was recognized and applied against a trespasser in *Johnson v. Ballou* 28 Mich. 396, and the principles laid down in Viner's Abridgment and in Cruise were quoted, and a number of authorities, state and federal, were cited in support of the doctrine.

*Fisher v. Hallock* is quite analogous in its facts to this case. Williams, on July 23, 1836, gave to Henry Rowland, through whom the plaintiff claimed, a deed of bargain and sale of the lands, but without covenants. The deed recited that the grantor had on that day entered the land at the Land-office at Bronson, Michigan, as described in the duplicate certificate of T. C. Sheldon, receiver, No. 18,760. May 1, 1839, a patent of the United States purporting to convey the same land to Williams, and based on certificate No. 18,760, was duly issued, and the only question on this branch of the case was whether Rowland, the grantee of Williams

previous to the patent, was entitled to the conveyance made by this patent, and whether the patent and the deed constituted together an affirmative showing of title in Rowland. The defendant claimed title through Williams by deed subsequent to the date of the patent.

In the present case there is no recital of any claim having been filed with the register and receiver, but the deed grants the premises, by a description equally certain, by the following language, viz. : " All that tract of land described upon the map of the United States survey of township forty-seven north, of range one east, Chippewa county, Michigan, as made by John Mullett, deputy surveyor, and known heretofore as the Mission Reserve, containing six hundred and forty acres of land." This land was described in the claim made in behalf of defendant, filed with the register and receiver, as " all that certain piece or parcel of land lying and situate in township 47 north, of range one east, of the United States survey, being one section of land, reserved from public sale, and appropriated to the use of said mission about the year 1835, surveyed and set off to said mission by the United States surveyor, John Mullett, and fully described on the United States maps and plats as the Methodist reserve for missionary purposes, in the year eighteen hundred and forty-five." This claim, at the time the deed was executed, was further designated as No. 153. The claim was confirmed as No. 153, and according to the survey made in 1845 by John Mullett, with metes, bounds, courses and distances as surveyed and laid down on the official township plat on file in the general Land-office. The patent issued refers to the confirmation of this claim by its number (153), and to the survey of the missionary reserve made by John Mullett in 1845. There is sufficient, therefore, in the deed to connect it with the claim then filed and reported as No. 153 of the missionary reserve, and to bring it within the principle of the case of *Fisher v. Hallock*, which held that the patent when issued to Williams related back to the time of the purchase, and gave the patentee title as of that date.

The fact that the Missionary Society was not a purchaser,

and had no interest in the land at the time of the conveyance which it could enforce against the United States, makes no difference in the principle, or the application of it. If it was intended by the United States as a mere gratuity, yet if certain steps are prescribed by it to secure such bounty, which, when taken, ripens into a title based upon such action, the principle is as applicable as it would be under a law permitting entries of the public land to be made on payment of the price prescribed therefor; because the principle is founded in the policy of the law which concludes the truth in order to prevent fraud and falsehood, and which imposes silence on a party *only* when in conscience and honesty he should not be allowed to speak. And in the forum of conscience is not the defendant precluded from asserting title or rights acquired by virtue of the patent in opposition to its deed, when such after-acquired title is based upon the claim filed with the register and receiver, and whatever rights were secured thereby to defendant, either at law or in equity, it conveyed to Whitney upon a full consideration paid to it?

The principle to be applied in this class of cases, deducible from the authorities, may be formulated as follows:

*When a claim to land is filed in pursuance of statutory authority, which is or may be the basis of a title from the political power, and a patent is afterwards issued, based upon such claim, it will relate back and take effect as of the date of filing such claim, and enure to the benefit of the assignee or grantee of the claimant intermediate the date of the filing of the claim and patent, and estop the patentee, or any party claiming under him, with notice, from asserting title or rights in contravention of such assignment or grant, even though such assignment or grant be without warranty.*

It was the duty of Whitney, and not of the defendant, to pay the assessment fixed by the authorities, as a condition precedent to the confirmation of the report and of issuing a patent. His conduct shows that he so regarded it. The defendant was not, therefore, injured by the laches of Whitney in paying the assessment. He took his chances of the Commissioner's refusing to confirm the report, and of the land

being disposed of by the government to other parties. In any event it was no concern of the defendant. It had very properly refused to pay the assessment, and when paid by any person it would hold the legal title in trust for its grantee, or assigns, under the deed delivered to Whitney. Defendant was shown the contract in 1874. It then repudiated that part of the agreement made by Shaw, that it should obtain a patent with the least possible delay, and, if it had been content to rest there, no ratification of that part of the contract could be imputed to it; but when afterwards it acted upon the matter covered by that clause, and procured the patent, it may be justly said that it ratified that clause also, and must be held to have obtained it pursuant to the agreement, and to be the depository of the legal title in trust for Whitney and his grantees.

The defendant, by its counsel, in presenting this case to the court, has stated that defendant did not insist upon any technicalities, legal or otherwise; that its action was based upon what it supposed and insisted upon was the fact, that Whitney had never paid the balance of the purchase money, and that its deed had never been delivered, and it therefore had the right to treat the contract as abandoned, and to secure to itself the benefits of the Acts of Congress by complying with their terms.

I have found from the evidence that the consideration was paid and the deed delivered, and, upon the principles of law applicable to the facts in the case, that the defendant is estopped by its deed, and that the title acquired by it relates back to the date of filing its claim and enures to the benefit of complainants as succeeding to the title through Whitney, the defendant's grantee.

For the reasons before stated, the decree appealed from should be affirmed, with costs, and the record remanded for further proceedings in the court below.